# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA

|  |  |
|---|---|
| NATIONAL AUDUBON SOCIETY, INC., <br><br> Plaintiff, <br><br> v. <br><br> U.S. ARMY CORPS OF ENGINEERS; WILLIAM GRAHAM, JR., in his official capacity as Chief of Engineers and Commanding General; BRANDON BOWMAN, in his official capacity as Commander and District Engineer; <br><br> U.S. FISH AND WILDLIFE SERVICE; DOUGLAS BURGUM, in his official capacity as Secretary of the Interior; PAUL SOUZA, in his official capacity as Acting Director, and LARRY WILLIAMS, in his official capacity as State Program Supervisor, <br><br> Defendants. | Civil Case No. 2:25-cv-684 |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

This case arises out of actions by the U.S. Fish and Wildlife Service (FWS) and the U.S. Army Corps of Engineers (Corps), granting approval under the Clean Water Act and Endangered Species Act for a 6,700-acre development with 10,000 homes and 750,000 square feet of commercial and hotel space. The agencies' actions threaten the critical regional habitat for endangered and threatened species, including the critically endangered Florida panther, as well as Plaintiff's

1

adjacent Corkscrew Swamp Sanctuary, one of only forty-one sites in the U.S. designated as a Ramsar Convention Wetland of International Importance.[1] Plaintiff National Audubon Society brings this suit to enforce federal environmental law, namely the Clean Water Act (CWA), 33 U.S.C. §§ 1251 et seq., Endangered Species Act (ESA), 16 U.S.C. §§ 1531 et seq., and the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 et seq.

## **INTRODUCTION**

1.      This case concerns federal agencies' approval of a proposed 10,000-home development on natural and former agricultural lands in southeastern Lee County, Florida—and the agencies' illegal failure to incorporate feasible alternatives and mitigation essential to minimize the development's adverse effects on a neighboring property, the world-renowned Corkscrew Swamp Sanctuary, as well as on substantial regional habitat for many endangered and threatened species.

2.      Unless vacated by the Court, the agencies' illegal actions here will harm endangered and other species in this internationally important ecosystem in the Florida Everglades. The Project as approved will harm the ability of endangered species to access critical connections between protected habitat

---

[1] As described by the U.S. Fish and Wildlife Service: "The Convention on Wetlands (often referred to as the 'Ramsar Convention') is the oldest of the modern global intergovernmental environmental agreements. The treaty was negotiated through the 1960s by countries and non-governmental organizations concerned about the increasing loss and degradation of wetland habitat for migratory waterbirds. It was adopted in the Iranian city of Ramsar in 1971 and came into force in 1975."

essential for their survival, adversely impact regional water quality and habitat values in the 70,000-acre Corkscrew Regional Ecosystem Watershed (CREW) preserve, and inhibit National Audubon Society's ability to manage its 13,400-acre Corkscrew Swamp Sanctuary to protect the species that rely on it, including essential fire-management. These significant adverse impacts are unnecessary and impermissible by law, as reasonable alternatives exist and were presented to the agencies, and additional mitigation measures necessary to fully address all unavoidable impacts were available, but were not required by the agencies or apparently even seriously considered by them. What's more, despite the very significant size and widespread impacts of the Project, the agencies failed to take a hard look at the effects of the proposed Project, issuing their approvals with no Environmental Impact Statement, and without a public hearing, in violation of law.

3.    Plaintiff National Audubon Society, Inc. (Audubon) is a national non-profit organization whose mission is to protect birds and the places they need, today and tomorrow. Audubon works to conserve and restore natural ecosystems, focusing on birds, other wildlife, and their habitats for the benefit of humanity and the earth's biological diversity. A critical part of Audubon's mission is its work operating conservation action centers and sanctuaries, and employing leading research scientists and policy staff, around the United States to ensure critical habitats, and the species that depend on that habitat, are protected.

4.    Corkscrew Swamp Sanctuary, located in northern Collier County and

3

bordering the Project site, is known as the jewel in the crown of Audubon's conservation action centers (Corkscrew Sanctuary or Sanctuary). The 13,400-acre Sanctuary contains internationally-renowned and pristine old growth and pond cypress forest, pine flatwoods, marsh, and other highly sensitive lands at the headwaters of the Cocohatchee Slough and Imperial River watersheds. Corkscrew Sanctuary sits in a critical location, connected to the public trust resources of the Corkscrew Regional Ecosystem Watershed (CREW)—a 70,000-acre preserve that spans the eastern border of Lee and Collier counties, providing refuge for many bird and large mammal species in a region recognized both as important habitat and under threat from increasing development.

5.     It is in this crucially important region that the Corps and FWS have granted federal—Permit No. SAJ-2024-00967 (SP-MAO)—to CAM7-Sub, LLC to build approximately 10,000 homes and 750,000 square feet of commercial and hotel space on property comprising more than 6,700 acres (the "Project"). The proposed Project is in the rural, southeast corner of Lee County in an area that has been identified as habitat for: the endangered Florida panther, Everglade snail kite, and Florida bonneted bat; the proposed-listed endangered tricolored bat; and the threatened crested caracara, wood stork, and eastern indigo snake. The area includes current and restorable north/south and east/west corridors or movement linkages that could enable the expansion of Florida panthers regionally and north of the Caloosahatchee River; these corridors have been deemed critical for the survival and recovery of the species.

6.     Audubon's Corkscrew Sanctuary abuts the southern border of the proposed Project, and—from the beginning of plans for the Project—Audubon sought to work with its neighbor to ensure that the construction and operation of the proposed Project did not unreasonably harm Audubon's property and its critical and increasingly rare environmental resources.

7.     Audubon has formally and informally commented on this Project, and has tried to work collaboratively with the developer and agencies to reconsider elements of its Project crucial to protecting Audubon's property and conservation interests in Corkscrew Sanctuary. During the public comment period for the agency action challenged in this case, Audubon proposed reasonable and practicable suggestions for alternative designs to minimize the Project's adverse effects and protect the habitat of crucial endangered and threatened species. These suggestions included: appropriate buffers between development and Sanctuary habitats requiring prescribed burning and hydrologic restoration; connections needed for wildlife movement between preserved areas; sufficient wildlife crossings and underpasses for animals to safely cross roads; and modifications to stormwater and mitigation plans to protect regional water quality, public lands, and private ecological preserves, among others. In granting their approvals for the Project, the Corps and FWS ignored these specific, practicable suggestions.

8.     The procedural history of the Project is complicated. In 2020, the federal government delegated to the State of Florida the authority to administer the CWA's Section 404 Program, a permitting program for projects that would

dredge or fill "waters of the United States" including many wetlands. The Project was initially reviewed through the State 404 Program. However, in 2024, a federal court overturned that delegation, finding that the approach Florida and the federal government had agreed to take to address the impacts of proposed permits on endangered species did not comply with the ESA.

9.     As a result, the permit application was returned to the Corps, which had to begin the process of reviewing the Project again. The federal permit review process required the Corps to comply with NEPA public process and environmental evaluation requirements. It also required the FWS and the Corps to comply with specific ESA requirements to address the potential for jeopardy and incidental take of endangered and threatened species that had not been part of the state approval process.

10.    The Corps's and FWS's actions approving the Project and proposed mitigation for its impacts fall far short of what federal environmental laws require. In violation of the ESA, the agencies ignored the best available science in evaluating impacts to endangered and threatened species—both impacts to habitat, including critical large mammal movement linkages, and impacts caused by dramatically increased traffic generated by the Project. In violation of the CWA, the Corps failed to consider clear, practicable alternative designs that would protect water quality and minimize adverse effects on the Corkscrew Sanctuary and multiple species' habitat. In violation of NEPA, the Corps failed to properly analyze a reasonable slate of alternatives to the proposed action, neglecting to

consider numerous practicable design alternatives that would have met the Project applicant's goals and objectives while improving wildlife corridors, lessening impacts to wetlands and waterways, and reducing overall impacts to regional ecosystems. The Corps also fell short in not allowing for adequate public engagement regarding its approval of the Project. In short, Defendants are violating the ESA, 16 U.S.C. § 1531 et seq., the CWA, 33 U.S.C. § 1251 et seq., NEPA, 42 U.S.C. § 4332 et seq., and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq.

11.     This Complaint seeks declaratory and injunctive relief to require the Corps and FWS to ensure the Project complies with the law, implements all practicable techniques to minimize its adverse effects, and protects crucial regional endangered and threatened species habitat, including the internationally-renowned Corkscrew Sanctuary.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over the parties and this action pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 2201 (declaratory relief), 5 U.S.C. §§ 701-706 (judicial review of agency action under the Administrative Procedure Act (APA)).

13.     Venue is proper in the United States District Court for the Middle District of Florida pursuant to 28 U.S.C. § 1391(e).

**PARTIES**

**Plaintiff**

14.     Plaintiff National Audubon Society is a not-for-profit corporation organized under the laws of New York. Audubon has more than 367,000 members, offices in 23 states, including its Florida program, Audubon Florida, and a presence in all 50 states through more than 450 certified chapters, its conservation action centers, its sanctuaries, and its education and science programs. Audubon's mission is to protect birds and the places they need, today and tomorrow. Audubon works to conserve and restore natural ecosystems, focusing on birds, other wildlife, and their habitats for the benefit of humanity and the earth's biological diversity. In southwest Florida, Audubon owns 13,400 acres of internationally renowned and pristine old growth bald cypress forest, pine flatwoods, marsh, and other highly sensitive lands at the headwaters of the Cocohatchee Slough and Imperial River watersheds. This land, the Corkscrew Swamp Sanctuary, historically hosted the largest breeding wood stork colony in the United States. Audubon conducts considerable scientific research, land management, and educational and recreational activities on the Corkscrew Sanctuary and surrounding lands. Audubon has invested over $5 million to date in restoring wetlands and habitats within the Sanctuary that have been impacted by past activities at the proposed Project site. The Corkscrew Sanctuary hosts more than 80,000 visitors annually, which is a substantial funding source for fulfilling the Sanctuary's mission.

15.     Plaintiff brings this action on its own behalf and on behalf of its

8

members, many of whom regularly enjoy and plan to continue enjoying educational, recreational, scientific, spiritual, and nature-based activities in the Sanctuary.

16.     The proposed 6,700-acre Project is immediately adjacent to and hydrologically upstream of Audubon's 13,400-acre Sanctuary and the public trust resources of the Corkscrew Regional Ecosystem Watershed (CREW)—a 70,000-acre regional land conservation project that spans key watershed portions of eastern Lee and Collier counties, all of which have a high level of ecological connectivity to the area to be transformed by the Project.



17.     The Corkscrew Sanctuary celebrated its 70th year in 2024. The Sanctuary is home to many imperiled species of plants and animals, including the Florida panther, ghost orchid, Florida bonneted bat, crested caracara, and snail

9

kite, and is a key nesting site for wood storks. This watershed also provides critical habitat for migratory and non-resident birds. As the private landowner of this immense conservation preserve immediately adjacent to the proposed Project, Audubon's economic use, conservation land management, and ecological restoration missions—as tied to Corkscrew Sanctuary—will be significantly harmed and impeded if this Project is permitted as proposed. Audubon conducts publicly important research on methods to restore essential public water and wildlife resources that are relevant to public trust resources throughout the Western Everglades region. One-half million Audubon members and supporters visit and/or donate to the Sanctuary annually.

18.    Audubon members and visitors regularly enjoy walking the 2.25 mile boardwalk through many of the diverse habitats of the Sanctuary as well as surrounding CREW preserves, looking for peace, quiet, wildlife, rare plants, and majestic 500-year-old trees. When exhilarating experiences occur, such as seeing a Florida panther, otters, black bears, barred owls, alligators, or wading birds, visitors share images and accounts online, enhancing interest in the nature viewing communities, driving further visitation at the Sanctuary, and thus supporting the Sanctuary's ecological and economic sustainability. Many of these members and visitors have become so committed that they become volunteers in the many varied operations of the Sanctuary. Corkscrew Sanctuary's volunteers number well over 110 at present, including a dedicated Sustainability Board of philanthropic and natural resource conservation leaders in the region.

10

19.    The injuries described are actual, concrete injuries presently suffered by Plaintiff and its members, and they will continue to occur unless this Court grants immediate relief. The relief sought herein would redress those harms. Plaintiffs have no other adequate remedy at law.

## Defendants

20.    Defendant U.S. Fish and Wildlife Service (FWS) is an agency within the U.S. Department of the Interior and has the delegated responsibilities of administering and implementing the ESA. FWS issued the Biological Opinion at issue in this case.

21.    Defendant Larry Williams is the State Program Supervisor for the Florida Ecological Services Office of the United States Fish and Wildlife Service (FWS) and is legally responsible for the Biological Opinion at issue in this case. Defendant Doug Burgum is the Secretary of the United States Department of the Interior and Defendant Paul Souza is the Acting Director of the United States Fish and Wildlife Service (FWS)—both are legally responsible for all decisions of the FWS, including the decisions implementing the ESA and complying with the APA. Defendants Williams, Burgum, and Souza are hereinafter referred to as "FWS."

22.    Defendant U.S. Army Corps of Engineers (Corps) is a federal agency organized under the U.S. Department of Defense. The Corps is charged with administering permits under section 404 of the CWA for the discharge of dredged or fill material into the waters of the United States and ensuring that the requirements of NEPA and the ESA are fulfilled in connection with all evaluation

11

and decision-making concerning such permits. The Corps's regulatory district office in Jacksonville, Florida, oversees the regulatory program in Florida. The Corps issued the Environmental Assessment for the 404 permit at issue in this case.

23. Defendant Brandon L. Bowman is the Commander and District Engineer of the Jacksonville District of the United States Army Corps of Engineers (Corps). He signed the original Memorandum for Record: Environmental Assessment and Statement of Findings that Plaintiff here challenges. Defendant William H. Graham Jr. is the Chief of Engineers and Commander of the U.S. Army Corps of Engineers and is legally responsible for all decisions of the Corps in implementing the Corps's responsibilities under the ESA, CWA, and NEPA, including actions leading to the permit issued by the Corps for the dredging and filling of wetlands for the Project. Defendants Bowman and Graham Jr. are hereinafter referred to as the "Corps."

24. Defendants' failure to comply with federal laws relating to the protection of wetlands, endangered species, and environmental analysis when permitting the Project has harmed and will continue to directly and substantially harm the interests of Plaintiff and its members.

25. The relief sought herein will redress the harms to Plaintiff and its members caused by Defendants' activities.

## FACTUAL BACKGROUND

### History of the Project

26.    In July 2022, CAM7-Sub, LLC submitted a permit application to the Florida Department of Environmental Protection (FDEP) under the state's Section 404 CWA permitting program. At that time, FDEP was operating the CWA 404 program under authority granted by the U.S. Environmental Protection Agency (EPA).

27.    Following two requests for additional information and correspondence with the FWS, FDEP issued a public notice on November 20, 2023 regarding the permit application. FDEP held a public meeting related to the permit application on January 16, 2024.

28.    On February 15, 2024, the U.S. District Court for the District of Columbia vacated EPA's approval of FDEP's assumption of the Section 404 permitting program, stripping the state of its authority to continue operating the program. Authority to oversee the 404 program reverted to the Corps.

29.    On April 2, 2024, CAM7-Sub, LLC applied for a Section 404 CWA permit with the Corps. The permit application proposed the construction of a residential and commercial community in Lee County, covering 6,687.5 acres and with expected impacts to 12.87 acres of wetlands and 128.32 acres of waters of the United States (WOTUS).

30.    On June 12, 2024, the Corps published a public notice regarding the 404 permit application, No. SAJ-2024-00967 (SP-SJF). This notice did not set a

public hearing on the permit, but directed members of the public to request one in writing if interested.

31. On June 25, 2024, the Corps submitted a request for formal consultation with FWS under Section 7 of the ESA. The Corps requested concurrence from FWS regarding its endangered species evaluation.

32. The Corps made the following initial "effects" determinations: Everglade snail kite (No Effect); Red cockaded woodpecker (No Effect); Florida scrub jay (No Effect); Florida grasshopper sparrow (No Effect); eastern indigo snake (Likely to Adversely Affect); wood stork (Not Likely to Adversely Affect); crested caracara (Likely to Adversely Affect); Florida bonneted bat (Likely to Adversely Affect); Florida panther (Likely to Adversely Affect).

33. In July 2024, after communicating with FWS, the Corps updated its effects determinations for the Everglade snail kite from "No Effect" to "Not Likely to Adversely Affect," and added an effects determination for the proposed-listed tricolored bat of "Likely to Adversely Affect."

34. On January 17, 2025, the FWS issued a Biological Opinion for the proposed permit issuance, concluding its formal consultation process. *See* U.S. Fish & Wildlife Serv., Biological Opinion (Jan. 17, 2025) (hereinafter "BiOp"). The FWS's final effects determinations differed slightly from those of the Corps, finding the project "Not Likely to Adversely Affect" the Everglade snail kite, Florida bonneted bat, and the wood stork, and finding the level of anticipated take is "not likely to result in jeopardy" for the crested caracara, eastern indigo snake, Florida

14

panther, and tricolored bat. BiOp at 10-11, 36.

| Species | EA Determination | BiOp Determination |
|---|---|---|
| Everglade Snail Kite | Not likely to adversely affect | Not likely to adversely affect |
| Florida Bonneted Bat | Likely to adversely affect | Not likely to adversely affect |
| Wood Stork | Not likely to adversely affect | Not likely to adversely affect |
| Crested Caracara | Likely to adversely affect | Not likely to result in jeopardy |
| Eastern Indigo Snake | Likely to adversely affect | Not likely to result in jeopardy |
| Florida Panther | Likely to adversely affect | Not likely to result in jeopardy |
| Tricolored Bat | Likely to adversely affect | Not likely to result in jeopardy |

35.    The Corps issued a final environmental assessment (EA) for the project on May 8, 2025. The EA culminated in a finding of no significant impact (FONSI) for the project, concluding that no EIS was necessary and closing the formal NEPA analysis process. U.S. Army Corps of Eng'rs, Environmental Assessment (May 8, 2025) (hereinafter "EA") at 56.

36.    Prior to the completion of the EA and FONSI, the Corps drafted an initial 404 permit (No. SAJ-2024-00967 (SP-MAO)), which was issued to and signed by the applicant on April 15, 2025, and signed by the Corps on April 18, 2025. Notwithstanding the April signature dates, the Corps's online permit database states this permit was issued on June 26, 2025.

15

37.    Throughout the permitting and NEPA process, the Corps and FWS received a large number of comment letters from stakeholders, many of whom requested a public meeting regarding the permit application. The Corps opened a public comment period following its notice of receipt of the Project's 404 permit application (June 14-July 14, 2024) during which time the Corps received thousands of comments. Despite the flood of public comments, the Corps "determined there was not a valid interest to be served by a public meeting, as all comments provided to the Corps during the Public Notice comment period [had] been addressed and there [was] not a likelihood of further useful information to be gained as a result of a meeting." EA at 9. No further public meetings were held on the Project before the issuance of the 404 permit or the completion of the EA or BiOp.

38.    The Corps did not open a public comment period following the publication of the EA, and in fact did not publish the EA anywhere. Plaintiff had to acquire a copy of the final EA through a Freedom of Information Act (FOIA) request.

## **Project is Adjacent to Corkscrew Swamp Sanctuary**

39.    The Project site is directly adjacent to the Corkscrew Sanctuary, owned and operated by Audubon.

40.    Corkscrew Sanctuary is a 13,400-acre nature preserve, encompassing a variety of habitats including pine flatwoods, cypress swamps, marshes, wetlands, and wet prairies. These habitats are filled with over 700 plant species, 29 of which

are federally threatened or endangered, including the well-known ghost orchid. Corkscrew Sanctuary is home to the largest remaining old-growth bald cypress forest in the world, which provides habitat for the federally threatened wood stork. It also provides habitat for numerous animal species, including many ESA-listed species like the Florida panther and the eastern indigo snake. Because of its size and the increasing threats of development in the surrounding region, it also offers critical wildlife pathways for listed animals like the Florida panther and crested caracara, which require large, many-acre home ranges.

41.    In addition to its inherent ecological value, Corkscrew Sanctuary is a regionally significant component of the Western Everglades and regional treasure that draws visitors from all over the world. Audubon recorded 80,000 visitors and 2,000 school students in 2024. Data from ebird.org, Cornell University's online birding database, reports 6,880 unique visitors to the Sanctuary since the database was launched in 2002—these are birders who come to observe and document the unique birds that frequent Corkscrew Sanctuary.

42.    Audubon charges admission to Corkscrew Sanctuary, and offers an annual membership program to fund the Sanctuary's restoration efforts, as well as its operation and maintenance. Over the 70-year history of the Sanctuary, Audubon and its partners, including the state of Florida, have invested millions of dollars in the Sanctuary's infrastructure, land management, restoration, staff, research, and public tourism facilities. The opportunity to safely and unobtrusively

observe endangered, threatened, and other wildlife within a world-renowned ecosystem is a primary reason that people recreate in the Sanctuary.

43. Audubon's economic use of the property is dependent on its ability to attract paying visitors to observe thriving wildlife and healthy wetlands. The Project will degrade the wetlands and wildlife habitat in and around Corkscrew Sanctuary, and sever large mammal regional movement linkages, which will reduce the Sanctuary's appeal for wildlife and, as a result, for visitors who are interested in observing them.

44. The Project will have a direct and significant adverse impact on the health of Corkscrew Sanctuary's ecosystems, all which will impact Audubon's economic, scientific, land management, and recreational use of its property.

45. The Corps EA concluded, however, that the Project will have only "Beneficial" economic impacts, giving no consideration whatsoever to the adverse economic impacts that result from the degradation of natural resources upon which regional industries rely—particularly the eco-tourism occurring at Corkscrew and elsewhere nearby in CREW preserves and the Western Everglades. EA at 28.

**Importance of the Region to Endangered and Threatened Species**

46. In addition to abutting the Corkscrew Sanctuary, the Project site is situated in the greater Western Everglades, a region that provides essential habitat to numerous endangered and threatened species, including the Everglade snail kite, the Florida bonneted bat, the wood stork, the crested caracara, the eastern

indigo snake, the Florida panther, and the tricolored bat. Over fifty percent of this historic Everglades habitat has already been lost to development and agriculture.

47.   Though much of the project site has already been developed for past agriculture, the vast majority—if not all—of the site's citrus fields are inactive, and the site remains important breeding, foraging, hunting, and nesting habitat for many species, as well as a pathway for regional wildlife movements. Agricultural lands have been recognized as providing habitat value for the Florida panther.

48.   The critically-endangered Florida panther serves as a useful indicator of the ecological health of the region, as many of the threats impacting panthers also impact other native species in the region, including birds. These impacts include: habitat loss; habitat fragmentation; vehicle strike mortality; loss of genetic diversity; noise and light pollution; introduced disease; degraded water quality; and intra-species aggression.

49.   The Florida panther is the official state animal of Florida. It once roamed much of the southeastern U.S. Though its range is now limited to the Florida peninsula, its listing as endangered under the ESA, and the protections afforded the panther under that law, have allowed its population numbers to rebound. Nevertheless, the Florida panther still faces considerable risks as Florida continues to develop and its viable habitat dwindles and fragmentation and vehicle impacts increase.

50.   The most widely-accepted panther population estimates range from 120-230 adults and subadult panthers, based on 2015 data. More recent studies

19

have suggested that panther numbers currently are declining, and human intervention will likely be required to maintain resilience through genetic diversity.

51. Panthers are susceptible to "[h]abitat loss from residential, commercial, and agricultural development and other human related activities associated with the continually increasing human population in Florida," an issue FWS identifies as the primary threat to long-term species viability. BiOp at 15. Habitat loss may manifest directly, when panther habitat in wild and rural lands is converted to more intense human use, or piecemeal through fragmentation, when development divides remaining viable habitat into disconnected islands.

52. The importance of maintaining and supporting important landscape connections in current panther habitat, particularly between the Big Cypress Core Habitat Region and the CREW area and the Big Cypress Core Habitat Region and Okaloacoochee Slough area, is well-recognized. A 2022 study, *Wildlife Habitat Conservation and Connectivity Planning for the Corkscrew Road Area*, evaluated current and future habitat connectivity in the specific region where the Project is located based on wildlife movement patterns and existing and future land use plans, and identified a practical and sustainable network of wildlife habitat reserves and linkages providing for both ecological connectivity and diverse land use needs (e.g., conservation, residential, agriculture and mining). This study and consultations with its author is the basis for Audubon's recommendations— ignored by the agencies—to restore and protect both a functional (minimum 600- foot width for the entire length) east/west and north/south large mammal

movement linkage between the vital regional CREW, Corkscrew Sanctuary, Lee County, Collier County, and other preserve habitats.

## Adverse Impacts of the Project

### Habitat impacts

53.    The Project will convert approximately 3,393.61 acres of panther habitat to commercial and residential development, including 498.06 acres in the Primary Zone and 2,895.55 acres in the Secondary Zone of the Service's Panther Focus Area. BiOp at 24. FWS defines Primary Zone as all lands essential for the survival of the Florida panther in the wild. A Secondary Zone includes lands contiguous with the Primary Zone, and areas which panthers may currently use, and where expansion of the Florida panther population is most likely to occur. The FWS states it does not expect panthers or their prey to use the area once the Project has been constructed. *Id.*

54.    The Project will convert to development approximately 3,238.85 acres of suitable crested caracara habitat, an area that could support portions of up to six caracara pairs' territories, or an entire territory for a nesting pair. BiOp at 21.

55.    The Project will affect the nests and/or territory of at least 36 adult eastern indigo snakes (27 nests) through land clearing and construction activities. BiOp at 23.

56.    The Project will affect 3,371.3 acres of potential tricolored bat habitat, which may result in direct mortality, harassment during construction activities, and a disruption of normal behaviors. BiOp at 29.

**Vehicle and equipment impacts**

57.    The Project will increase the vehicular traffic in and around the Project site, both during construction and after the Project is completed. Increased road traffic will lead to an increased risk of mortality through vehicle collisions for the Florida panther and the eastern indigo snake.

58.    Statewide, panther vehicle mortality (PVM) is the most-recorded cause of death for adult panthers, according to FWC's database. Of the ten recorded panther deaths year-to-date in 2025, nine (90%) have been caused by vehicle strikes. Of the thirty-six recorded panther deaths in 2024, twenty-nine (80.55%) were caused by vehicle strikes. Between 1982—the year panther monitoring began—and January 2025, 315 of the 427 recorded panther deaths were caused by vehicle strikes, representing 73.77% of all recorded panther mortalities.

59.    Panther injuries and mortalities due to motor vehicle strikes are commonly documented in the "Action Area" the FWS evaluated for the Project— lands within twenty-five miles from the project site[2]—and represent the overwhelming majority of panther deaths in the Action Area. 315 panther deaths resulting from vehicle collisions have been recorded in the Action Area by the FWC from December 23, 1979, through January 10, 2025—with ninety-three of those recorded between September 2023 and January 2025.

---

[2] The twenty-five-mile Action Area is designed to encompass mean dispersal distance of sub-adult male panthers and encompasses the dispersal distance of both male and female panthers because male panther dispersal distances are known to exceed those reported for female panthers.

22

60.    Nonetheless, the FWS did not identify any incidental take—otherwise legal activity that that kills or injures wildlife—from PVM, concluding that no such take was reasonably certain to occur as a result of a development that is projected to nearly double the average annual daily traffic within twenty-five miles of the proposed development, adding 82,456 external trips per day.

61.    Instead of identifying incidental take for PVM, the FWS proposes to monitor the number of vehicle collisions with panthers and take steps necessary to reduce this number if it exceeds the annual current average of three panthers per year within 10 miles of the project. "If these PVM are determined to be a result of the Project, these steps can include construction of additional fencing, recommending installation of additional crossings, reducing speed limits, adding signage or other methods to increase driver awareness." BiOp at 34. This is not a clear numeric trigger at which the FWS would be required to reinitiate consultation to ensure that incidental take was not so large as to jeopardize the species; this is simply an opportunity for additional study, with no clear timeline nor any clear opportunity for public engagement.

**Wetland and water quality impacts**

62.    The Project will destroy 12.87 acres of wetlands and 128.32 acres of other waters. Additionally, wetlands and waters of the U.S. downstream of the Project will be the immediate recipient of unwelcome pollutants generated by the Project.

23

*Wetlands*

63.    On-site wetlands and surface waters—ditches and ponds—that would be filled or excavated as a result of the Project, provide early dry season forage opportunities for wading birds, particularly wood storks, which rely heavily on an 18.6-mile core foraging area around their colony sites and for which such early dry season foraging habitats are critical for nest initiation in this species. Wood storks have three active nesting colonies in this region and this project falls within the core foraging areas of all three of those colonies.

64.    Over eighty percent of early dry season foraging wetlands have already been lost in the Corkscrew colony's core foraging area alone, according to South Florida Water Management District[3] data and Audubon analysis. This results in increased reliance of wading birds and wood storks on ditches and man-made ponds.

65.    The EA does not assess these waters and wetlands for their comprehensive hydrologic functions including natural water storage, nor for wood stork and wading bird foraging values, and those functions are not being mitigated in the offsite credits or onsite restoration.

66.    The EA also fails to adequately account for the downstream impacts to CREW and the Corkscrew Sanctuary, a Ramsar-designated Wetland of

---

[3] The South Florida Water Management District is one of five regional water management agencies created by the Florida Legislature under section 373.069, Florida Statutes, and which has myriad responsibilities and authority under Florida law relative to the protection and restoration of the Greater Everglades Ecosystem and its associated water resources and environmental values.

24

International Importance.

### *Water quality*

67.    The EA indicates that regional hydrology has been significantly altered as a result of historic agricultural use, and suggests that the Project will improve water quality and wetland function as a result of mitigation to restore a portion of the Project site and "cessation of existing pumping" that would correspond with an elimination of "current agricultural uses." EA at 10.

68.    However, on information and belief, the present-day Project site is mostly fallow, there is minimal if any "current agricultural use," and the site is *not* discharging agricultural fertilizer and pesticide runoff and untimely irrigation effluent because former citrus operations there have largely—if not entirely— shut down long before this permit was issued.

69.    In fact, Audubon has spent more than $5 million to address water quality impacts related to past agricultural pollution—agricultural pollution no longer affecting the Corkscrew Sanctuary because regional agricultural operations have shut down.

70.    The Project includes water features that will be used "in a number of ways . . . [including] stormwater management, open space, supplemental irrigation, and embankment fill material." EA at 10. The lakes will "contribut[e] hydrology to the wetland flow-way system." *Id*.

71.    In comparison to the current reduced discharges from fallow fields, this Project design would significantly increase irrigation and stormwater lake dry

25

season supplementation from a shallow iron-laden aquifer, plus increase fertilizer and pesticide use due to predominant turf grass coverage, significantly degrading downstream waters. Urban stormwater and irrigation of lawns (another widespread "crop") will resurrect the impact of discharged pollution and hydrologic disruption, undoing Audubon's wetland restoration work.

72.    In addition, downstream waters are already currently impaired for iron and awaiting the identification of a Total Maximum Daily Load calculation by the State of Florida and the above permitted activities will increase the discharge of iron into the watershed.

### Unexamined Alternatives and Mitigation

73.    The Corps failed to consider any on-site reduced project footprint or alternative designs for the applicant's preferred alternative.

74.    In comments on both the BiOp and the 404 permit, Audubon proposed multiple detailed, practicable alternative project designs and mitigation to address the Project's extensive adverse effects on its property, the Corkscrew Sanctuary, and the broader regional ecosystem.

75.    In particular, Audubon proposed the following:

a. Providing an adequate buffer of at least one mile—similar to buffers agreed to in past projects—between the Project and adjacent public and private conservation lands to allow for vital prescribed burning and hydrologic management and restoration on CREW and Sanctuary habitats;

b. Reducing the depth of stormwater lakes to allow for submergent vegetation and expansive littoral plants which remove pollution and improve water quality and habitat values for wading birds and other animals;

c. Reducing turfgrass coverage to reduce irrigation, fertilizer, herbicides, and pesticide use, as well as reduce iron and nutrient pollution;

d. Not supplementing stormwater lakes with dry season groundwater pumping to avoid lowering groundwater levels and iron pollution;

e. Utilizing spreader swales at stormwater discharges (and not point source discharges); and

f. Redesigning the stormwater system for onsite treatment to avoid routing stormwater through public preserve wetlands on Lee County's Imperial Marsh Preserve and degrading those wetlands and adding nutrients to this preserve, a Lee County Basin Management Action Plan water quality project.

76. Audubon also emphasized the need to provide well-designed onsite mitigation to avoid jeopardy to and minimize any unavoidable incidental take of the Florida panther and other endangered and threatened species, and provided specific suggestions to minimize and mitigate the project's effects.

77. In particular, Audubon proposed the following:

a. Preserving a north/south large mammal linkage from the Project site to CREW and Corkscrew Sanctuary preserves and a sufficient east/west

27

linkage crossing Corkscrew Road on the Project's east side consistent with Dr. Dan Smith's 2022 Corkscrew Road wildlife road crossing study;

b. Implementing fencing and underpasses on Corkscrew Road to preserve these two large mammal movement linkages;

c. Prohibiting the broad use of insecticide to protect roosting and foraging habitat for both the tricolored bat and the Florida bonneted bat, and the use of rodenticide within the Project site to protect raptors (as well as domestic pets and children);

d. Requiring implementation of International Dark Skies community lighting criteria to protect the tricolored bat, Florida bonneted bat, and Florida panther;

e. Requiring the implementation of prescribed fire to realize habitat benefits for many species, including bats, Florida panther, gopher tortoises, and indigo snakes, among others; and

f. Requiring vaccination of cats within the Project site for feline leukemia as well as the implementation of an effective wildlife/human conflict reduction program.

78.  The Corps and FWS failed to consider and discuss any of these alternatives or mitigation in the EA/FONSI and BiOp for the Project.

## Cumulative Impacts

79.  These failures to appropriately consider the negative impacts of the Project, as more fully discussed above, also mar the Corps's analysis of the

extensive cumulative impacts of additional proposed developments in the area on the regional ecosystem, habitats, and species.

## STATUTORY AND REGULATORY BACKGROUND

## Endangered Species Act

80.    The ESA is the "most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Oregon*, 515 U.S. 687, 698 (1985) (quoting *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978)). The ESA assigns the lead role for administering the law to the Secretary of the Interior (for terrestrial species). The duties of the Secretary of the Interior have been delegated to FWS. *See* 50 C.F.R. § 402.01(b).

81.    Section 7 of the ESA provides that the Corps must consult with FWS and "insure that any action authorized, funded, or carried out by" the Corps "is not likely to jeopardize the continued existence of any endangered species." 16 U.S.C. § 1536(a)(2). "Jeopardize the continued existence of" means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species. 50 C.F.R. § 402.02.

82.    The agencies are required to engage in a formal consultation process, wherein the Corps and FWS must "use the best scientific and commercial data

29

available" in determining that the project will not jeopardize the endangered species. 16 U.S.C. § 1536(a)(2) In evaluating the impact of the project on the species, FWS is required to issue a biological opinion, which details "how the agency action affects the species or its critical habitat" and states FWS's opinion "as to whether or not the Federal action is likely to jeopardize the continued existence of the listed species or result in the destruction or adverse modification of critical habitat." 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.02.

83.     FWS must also consider whether a proposed agency action would result in the "take" of a listed species. "Take" is defined in the statute as "to harass, harm,[4] pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). Even where FWS "concludes that an action . . . and the resultant incidental take of listed species will not violate section 7(a)(2). . . [FWS] will provide with the biological opinion a statement concerning incidental take" that addresses the following:

a. Specifies the impact of incidental taking as the amount or extent of such taking. . .
b. Specifies those reasonable and prudent measures that the Director considers necessary or appropriate to minimize such impact of incidental taking on the species;
c. Sets forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency or any applicant to implement the measures specified under paragraphs (i)(1)(ii) and (iii) of this section. . ."

---

[4] According to 50 C.F.R. § 17.3, "*Harm* in the definition of 'take' in the [ESA] means an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering."

50 C.F.R. § 402.14(i)(1).

84.    Because each federal agency has the duty to ensure that its actions do not jeopardize the continued existence of a species, the action agency may not arbitrarily or capriciously rely on a "no-jeopardy" opinion. 5 U.S.C. §706(2)(A).

## Clean Water Act

85.    Congress enacted the Clean Water Act (CWA) in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." CWA § 101(a), 33 U.S.C. § 1251(a). In furtherance of this goal, the Act provides a comprehensive approach for the regulation of pollution discharged into the waters of the United States.

86.    The CWA prohibits "the discharge of any pollutant," including dredge or fill material, into waters of the United States unless a permit from the Corps has first been secured. 33 U.S.C. §§ 1311(a), 1344(a). Applications for Section 404 permits are reviewed under guidelines established by the EPA Administrator. 33 U.S.C. § 1344(b)(1); *see also* 40 C.F.R. Part 230, Subpart B.

87.    The Corps's CWA implementing regulations state:

> The Secretary of the Army has delegated to the Chief of Engineers the authority to issue or deny section 404 permits. The district engineer will review applications for permits for the discharge of dredged or fill material into waters of the United States **in accordance with guidelines promulgated by the Administrator**, EPA, under authority of section 404(b)(1) of the CWA. (see 40 CFR part 230.). . . [A] permit will be denied if the discharge that would be authorized by such a permit would not comply with the 404(b)(1) guidelines. If the district engineer determines that the proposed discharge would comply with the 404(b)(1) guidelines, he will grant the permit unless issuance **would be contrary to the public interest**.

31

33 C.F.R. § 323.6(a) (emphasis added).

88.    The "404(b) guidelines" state in relevant part that no discharge of dredged or fill material shall be permitted:

a. [I]f there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences,
b. [C]auses or contributes to violations of any applicable State water quality standard or jeopardizes endangered species or their critical habitat in violation of the ESA,
c. [W]hich will cause or contribute to significant degradation of the waters of the United States, and
d. [U]nless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem.

40 C.F.R. §§ 230.10 (a), (b), (c), & (d).

89.    In addition, the Corps's regulations set forth standards for its "public interest review":

The decision whether to issue a permit will be based on an evaluation of the **probable impacts, including cumulative impacts**, of the proposed activity and its intended use on the public interest. Evaluation of the probable impact which the proposed activity may have on the public interest requires **a careful weighing of all those factors** which become relevant in each particular case. **The benefits which reasonably may be expected to accrue from the proposal must be balanced against its reasonably foreseeable detriments.**

33 C.F.R § 320.4 (emphasis added).

90.    Factors that may be relevant to the public interest review are "conservation, economics, aesthetics, general environmental concerns, wetlands, historic properties, fish and wildlife values, flood hazards, floodplain values, land use, navigation, shore erosion and accretion, recreation, water supply and

32

conservation, water quality, energy needs, safety, food and fiber production, mineral needs, considerations of property ownership and, in general, the needs and welfare of the people." *Id.* § 320.4(a)(1).

## National Environmental Policy Act

91.     The National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321-4370, is the United States' national policy to promote efforts to prevent or eliminate damage to the environment and enrich the understanding of ecological systems and natural resources. 42 U.S.C. § 4321.

92.     NEPA requires federal agencies to prepare a detailed statement, an Environmental Impact Statement (EIS), in connection with "proposals for . . . major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). Agencies must take a "hard look" at the environmental impacts of their decisions before the actions occur, ensuring the agency, "in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). The statute also "guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Id.*

93.     An EIS must include an evaluation of a proposed action's "reasonably foreseeable environmental effects," including those that would be unavoidable as a result of implementing the action, and "a reasonable range of alternatives to the

action." 42 U.S.C. § 4332(C). To inform this evaluation, the action agency "shall . . . study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." *Id.* § 4332(H).

94.    The Corps's NEPA implementing regulations[5] explain an EA as follows:

> (a) *Purpose.* An EA is a brief document which provides sufficient information to the district commander on potential environmental effects of the proposed action and, if appropriate, its alternatives, for determining whether to prepare an [EIS] or a [Finding of No Significant Impact or FONSI] (40 CFR 1508.9). The district commander is responsible for making this determination and for keeping the public informed of the availability of the EA and FONSI.

---

[5] As of April 11, 2025, the CEQ regulations implementing NEPA have been removed from the Code of Federal Regulations. 90 Fed. Reg, 10,610 (Feb. 25, 2025). In rescinding its NEPA regulations, the CEQ emphasized:

> After this action, agencies will remain free to use or amend [their own implementing regulations], and **agencies should, in defending actions they have taken, continue to rely on the version of CEQ's regulations that was in effect at the time that the agency action under challenge was completed.** Thus, removing CEQ's regulations does not constitute a retroactive change in agencies' practices or an alteration of the public or project sponsors' engagement under NEPA with respect to those agency actions.

*Id.* at 10,614 (emphasis added).

Subsequently, the Corps moved to update its NEPA implementing regulations, announcing an immediately-effective interim final rule that established new regulations at 33 C.F.R. § 333. 90 Fed. Reg. 29,465 (July 3, 2025). This rule rescinded the Corps's NEPA implementing regulations codified at 33 C.F.R. § 325 Appendix B and 33 C.F.R. § 230.

The final agency action relevant to this Complaint's NEPA claims—the Corps's issuance of its May 8, 2025 EA—occurred while the Corps's NEPA implementing regulations at 33 C.F.R. § 325 Appendix B and § 230 were still in effect. Courts must look to the regulations in effect at the time analysis was conducted and a decision was rendered. The EA relied upon and cited to the Corps's NEPA implementation guidance at 33 C.F.R. § 325, which, prior to its July 3, 2025 rescission, itself cited to both 33 C.F.R. § 230 and the CEQ regulations at 40 C.F.R. §§ 1500-1508. To the extent that the regulations cited in the EA refer to repealed regulations, we defer to the Corps's discretion to continue following its existing procedures until the promulgation of a new rule on July 3, 2025. Moreover, this Complaint relies primarily on the NEPA statutory language, and thus any uncertainty regarding the applicability of specific agency rules is not material to Audubon's claims.

33 C.F.R. § 230.10; *see also* 33 C.F.R. § 325 App. B(7).

95.    A Corps EA must "include a discussion of the reasonable alternatives which are to be considered by the ultimate decisionmaker," including the "no action" alternative which, if selected, would result in denial of the permit. 33 C.F.R. 325, Appendix B(7)(a). The no action alternative provides a baseline against which the action alternative is evaluated. After assessing alternatives in an EA, the Corps may elect to issue a permit conditioned on modifications to the project. *Id.*

96.    In evaluating "a reasonable range of alternatives to the action," 42 U.S.C. § 4332(C), an agency's review of alternatives must be "sufficient to permit a reasoned choice." *N. Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533, 1541 (11th Cir. 1990).

97.    The Corps's regulations also state that its NEPA analysis "should include" an evaluation of "direct, indirect and cumulative impact[s]" resulting from the action. 33 C.F.R. 325, App. B(7). These include "ecological. . . economic, social, or health" impacts. 33 C.F.R. § 230.4 (adopting the definition of "effects" and impacts as given in 40 C.F.R. § 1508.8).

98.    Based on the findings made within an EA, and unless categorically excluded, the Corps will either prepare an EIS detailing the environmental impacts of a proposed project, or issue a FONSI, showing that the project will have no significant impact that would necessitate further study of the environmental consequences. 33 C.F.R. 325, App. B(7); *Hill v. Boy*, 144 F. 3d 1446, 1450 (11th Cir. 1998) (*quoting Sabine River Auth. v. U.S. Dep't of Interior*, 951 F. 2d 669, 677 (5th

Cir. 1992)) (summarizing longstanding CEQ guidance).

99.    The Eleventh Circuit has also set forth four criteria to to determine whether an action agency (here, the Corps) has acted properly in deciding not to prepare an EIS:

> (1) The Corps "must have accurately identified the relevant environmental concern;"
> (2) The Corps "must have taken a 'hard look' at the problem in preparing the EA;"
> (3) If a FONSI is made, the Corps "must be able to make a convincing case for its finding;" and
> (4) If the Corps finds "an impact of true significance, preparation of an EIS can be avoided only if the [Corps] finds that changes or safeguards in the project sufficiently reduce the impact to a minimum."

*Altamaha Riverkeeper v. U.S. Army Corps of Eng'rs*, No. CV 418-251, 2020 U.S. Dist. LEXIS 180987, at *19-20 (S.D. Ga. Sep. 30, 2020) (citing *Hill v. Boy*, 144 F. 3d 1446, 1450 (11th Cir. 1998)).

100.    Holding a public hearing for an EA is discretionary, but both the statute and the Corps's implementing regulations emphasize the importance of public input in assessing impacts and evaluating the need for a full EIS. 42 U.S.C. § 4331(a) (cooperating with the "concerned public" to make environmental policy decisions); 33 C.F.R. 325, App. B(7)(a) (stating an EA may not be completed until after "all relevant information is available (*i.e.*, after the comment period for the public notice of the permit application has expired)"); 33 C.F.R. § 230.10 ("The district commander is responsible for . . . keeping the public informed of the availability of the EA and FONSI."). Action agencies have discretion to publish draft EAs and to hold public meetings on EAs, but they must publish final EAs. 33

36

C.F.R. § 325, App. B(5) (citing 40 C.F.R. § 1506.6 ("Agencies shall. . . Provide public notice of NEPA-related hearings, public meetings, and the availability of environmental documents so as to inform those persons and agencies who may be interested or affected.")).

## Administrative Procedure Act

101.    The Administrative Procedure Act (APA) is the federal statute that governs agency actions and the procedures of administrative law, including judicial review.

102.    Under the APA, this Court reviews an agency action to determine whether the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 414 (1971). The Court must consider whether the agency's decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* at 416 (internal quotation marks and citations omitted); *see also Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.").

103.    FWS's Biological Opinion and the Corps's EA and FONSI are "agency

actions" subject to judicial review under the APA. 5 U.S.C. §§ 701(b)(2), 704.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Violations of ESA and APA

104. Plaintiff incorporates by reference all preceding paragraphs as if set forth herein.

105. The FWS's BiOp regarding the Project's impacts on the Florida panther and other endangered and threatened species as described herein is arbitrary, capricious, an abuse of discretion, not in accordance with law, and/or without observance of procedure required by law within the meaning of the APA, 5 U.S.C. § 706(2).

106. The FWS's BiOp failed to "use the best scientific and commercial data available" in determining that the project will not jeopardize the endangered species—including (1) in its analysis of the impact of the project on habitat degradation and critical large mammal habitat corridors or linkages, downplaying or ignoring the importance of the connected regional habitat to the survival and recovery of the Florida panther and other endangered and threatened species and (2) ignoring the best available data regarding panther vehicle mortality. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.

107. The FWS's BiOp arbitrarily and capriciously evaluated the current status and environmental baseline of the listed species, the effects of the action, and cumulative effects on the listed species in determining that the project will not

jeopardize the endangered species—including by unlawfully purporting to include panther vehicle mortality attributable to this Project instead as part of the "environmental baseline" and/or its "cumulative effects" analysis. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.

108. The FWS's BiOp arbitrarily and capriciously concluded that the proposed agency action would not result in the "take" of a listed species, the Florida panther, as a result of increased vehicle traffic generated by the Project, failing to specify both the amount of take and clear triggers at which allowable incidental take is exceeded and the FWS must reinitiate consultation. 50 C.F.R. § 402.14(g)(7)-(8) (requiring "a statement concerning incidental take, if such take is reasonably certain to occur"); *id.* § (i).

109. The FWS's BiOp arbitrarily and capriciously assessed and determined the need for Reasonable and Prudent Measures to minimize incidental take. 50 C.F.R. § 402.14(g)(7)-(8); *id.* § (i). The agency failed to require available Reasonable and Prudent Measures that would minimize the incidental take.

<u>**SECOND CLAIM FOR RELIEF**</u>
**Violations of CWA and APA**

110. Plaintiff incorporates by reference all preceding paragraphs as if set forth herein.

111. The issuance of the CWA Section 404 permit was arbitrary and capricious, an abuse of discretion, without observance of procedures required by law, and otherwise not in accordance with the law for at least the following reasons.

39

112.    The Corps issued a permit in violation of the 404(b)(1) guidelines because: (1) there are "practicable alternative[s] to the proposed discharge which would have less adverse impact on the aquatic ecosystem [that do] not have other significant adverse environmental consequences;" (2) the Project causes or contributes to violations of State water quality standards and jeopardizes endangered species or their critical habitat in violation of the ESA; (3) "will cause or contribute to significant degradation of the waters of the United States;" and (4) "appropriate and practicable steps have [not] been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem."

113.    Specifically, among other things, the Corps failed to (1) consider the following practicable alternatives and (2) take the following appropriate and practicable steps to minimize potential adverse impacts of the Project on the aquatic ecosystem:

 a. Adequately increasing the size of the proposed buffer between the Project and adjacent public and private conservation lands to allow for vital prescribed burning and hydrologic management and restoration on CREW and Sanctuary habitats;

 b. Reducing the depth of stormwater lakes to allow for submergent vegetation and expansive littoral plants which remove pollution and improve water quality and habitat values for wading birds and other animals;

 c. Reducing turfgrass coverage to reduce irrigation, fertilizer, herbicides,

and pesticide use, as well as reduce iron and nutrient pollution;

d. Not supplementing stormwater lakes with dry season groundwater pumping to avoid lowering groundwater levels and iron pollution;

e. Utilizing spreader swales at stormwater discharges (and not point discharges);

f. Preserving and restoring a north/south large mammal linkage from the Project site to CREW and Corkscrew Sanctuary preserves and an east/west linkage crossing Corkscrew Road on the Project's east side with minimum 600-foot width and necessary fenced crossings of Corkscrew Road; and

g. Redesigning the stormwater system for onsite treatment to avoid routing stormwater through public preserve wetlands on Lee County's Imperial Marsh Preserve to avoid degrading those wetlands and adding nutrients to the Lee County BMAP project.

114. The Corps's analysis failed to appropriately consider, analyze, or weigh the benefits of the Project against the individual or cumulative effects of the Project and surrounding proposed future developments on conservation, economics, aesthetics, general environmental concerns, wetlands, historic properties, fish and wildlife values, flood hazards, floodplain values, land use, navigation, shore erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, food and fiber production, mineral needs, considerations of property ownership and, in general, the needs

and welfare of the people when determining that the Project is in the public interest.

115.    The Corps also failed to adequately consider the impacts of the Project on neighboring environmental resources and properties, a reasonable alternative project design and footprint, and the cumulative impacts under 33 C.F.R. § 320.4.

## THIRD CLAIM FOR RELIEF
### Violations of NEPA and APA

116.    Plaintiff incorporates by reference all preceding paragraphs as if set forth herein.

117.    The Corps arbitrarily and capriciously concluded its Environmental Assessment for the Project with a Finding of No Significant Impact, failing to prepare an Environmental Impact Statement for an action with significant adverse impacts.

118.    The Corps arbitrarily and capriciously failed to take a "hard look" at the reasonably foreseeable impacts and consequences of the Project by:

a.  Overestimating the benefit of the Project's mitigation, restoration, and ecological measures, including the functionality of species pathways and panther linkages, wetland loss mitigation, and future monitoring and enforcement measures;

b.  Relying on flawed or incorrect assumptions underlying the BiOp—particularly by undervaluing the area's remaining panther habitat, failing to recognize the site and surrounding area as essential for species

42

connectivity, assuming the inevitability of development and habitat loss in the region, and arbitrarily evaluating panther vehicle mortality;

c. Failing to adequately analyze the Project's environmental and hydrological impacts on the adjacent Corkscrew Sanctuary;

d. Failing to analyze the Project's significant adverse economic impacts on the adjacent Corkscrew Sanctuary; and

e. Failing to account for impacts to water quality from stormwater lake dry season supplementation and turfgrass irrigation groundwater use, and ignoring reasonable and practicable alternatives to lessen these impacts.

119. The Corps failed to meet public hearing notice and comment requirements under the statute and its implementing regulations by:

a. Declining to hold a public hearing related to the permit issuance;

b. Issuing a signed "preliminary" permit to the applicant prior to the completion of the final EA;

c. Failing to address and incorporate the comments and suggestions from stakeholders and members of the public; and

d. Failing to publish a final EA and FONSI for public review.

120. The Corps failed to properly analyze a reasonable slate of alternatives to the proposed action, neglecting to consider numerous practicable design alternatives that would have met the Project sponsor's goals and objectives while improving wildlife corridors, lessening impacts to wetlands and waterways, and reducing overall impacts to regional ecosystems.

43

121.   The Corps's failure to adequately analyze the significant and adverse environmental impacts of its permit approvals is contrary to NEPA and its implementing regulations and therefore is arbitrary, capricious, and an abuse of discretion under the APA. 5 U.S.C. § 706(2).

**PRAYER FOR RELIEF**

122.   Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.  Declare Defendants to have violated and to be in violation of the Endangered Species Act, Clean Water Act, National Environmental Policy Act, and Administrative Procedure Act, as alleged herein;

b.  Vacate and set aside the challenged permit, Permit No. SAJ-2024-00967 (SP-MAO);

c.  Vacate and set aside the challenged Biological Opinion for Permit No. SAJ-2024-00967 (SP-MAO);

d.  Vacate and set aside the Environmental Assessment and Finding of No Significant Impact for Permit No. SAJ-2024-00967 (SP-MAO);

e.  Enjoin any construction activities pursuant to Permit No. SAJ-2024-00967 (SP-MAO) and the challenged Biological Opinion for that permit, unless and until Defendants comply with the Endangered Species Act, Clean Water Act, National Environmental Policy Act, and Administrative Procedure Act;

f.  Order Defendants to pay the costs of litigation, including Plaintiff's reasonable attorney fees, expert witness and consultant fees, and other costs, to the extent allowed by law; and

g.  Award any such other and further relief as this Court may deem appropriate.

Respectfully submitted this 1st day of August 2025.

/s/Francesca J. DiJulio

FRANCESCA J. DIJULIO
Fla. Bar No. 1050161
ELIZABETH FATA CARPENTER
Fla. Bar No. 123542
S. ANSLEY SAMSON
Fla. Bar No. 86398
EVERGLADES LAW CENTER
6815 Biscayne Blvd. Suite 103 #449
Miami, FL 33138
(786) 496-3309
ansley@evergladeslaw.org
elizabeth@evergladeslaw.org
francesca@evergladeslaw.org


/s/Richard Grosso

RICHARD GROSSO, ESQ.
RICHARD GROSSO, P.A.
6919 W. Broward Blvd.
Plantation, FL 33317
Mailbox 142
954-801-5662
richardgrosso1979@gmail.com

45

## CERTIFICATE OF SERVICE

I hereby certify that, on this the 1st day of August 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of the filing to all counsel of record.

Respectfully submitted,

*/s/Francesca J. DiJulio*

FRANCESCA J. DIJULIO
Fla. Bar No. 1050161
ELIZABETH FATA CARPENTER
Fla. Bar No. 123542
S. ANSLEY SAMSON
Fla. Bar No. 86398
EVERGLADES LAW CENTER
6815 Biscayne Blvd. Suite 103 #449
Miami, FL 33138
(786) 496-3309
ansley@evergladeslaw.org
elizabeth@evergladeslaw.org
francesca@evergladeslaw.org

46