UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

NATIONAL AUDUBON SOCIETY, INC.,

        Plaintiff,

    v.

U.S. ARMY CORPS OF ENGINEERS; LT. GEN. WILLIAM H. GRAHAM, JR., in his official capacity as Chief of Engineers and Commanding General; and COL. BRANDON L. BOWMAN, in his official capacity as Commander and District Engineer; U.S. FISH AND WILDLIFE SERVICE; DOUGLAS J. BURGUM, in his official capacity as Secretary of the Interior; BRIAN NESVIK, in his official capacity as Director; and LARRY WILLIAMS, in his official capacity as state Program Supervisor,

        Defendants,

and

CAM7-SUB, LLC, a Florida Limited Liability Company,

        Intervenor/Defendant.

_____/

Case No. 2:25-cv-684-KCD-DNF

## **ORDER**

A large mixed-use development is in the works for Southwest Florida.

It involves a ten-thousand-home residential community and another half-

million acres in commercial space. The location? Right next to a nature preserve.

The preserve's owner, Plaintiff National Audubon Society, Inc. ("Audubon"), wants to stop the bulldozers. It claims the federal government approved the project after overlooking its environmental effects and issuing half-baked reports. It sues Defendants U.S. Army Corps of Engineers and U.S. Fish and Wildlife Service, along with their executives, for flouting the Endangered Species Act, the Clean Water Act, and the National Environmental Policy Act. (*See* Doc. 27.)

Audubon now seeks a preliminary injunction to halt the project's federal permit until this case concludes. (Docs. 34.)[1] Defendants (and amici) have responded (Docs. 68, 73, 78), making this matter ripe. Because Audubon has not shown that any one of its claims is surely to succeed, its motion is **DENIED**.

## I. Background

The regulatory division of labor here is straightforward. The U.S. Fish and Wildlife Service ("FWS") handles the Endangered Species Act. (Doc. 27 ¶ 21.) The U.S. Army Corps of Engineers (the "Corps") issues dredge-and-fill permits under the Clean Water Act and ensures National Environmental

---

[1] Unless otherwise indicated, all internal quotation marks, citations, case history, and alterations have been omitted in this and later citations.

Policy Act compliance. (*Id.* ¶ 23.) Together, these agencies approved Defendant Cam7-Sub, LLC's ("Cam7") plan to build "a 6,700 acre development with 10,000 homes and 475,000 square feet of commercial and hotel space." (*Id.* at 1.) The Court refers to this as "The Project." (*Id.* ¶ 5.)

Right next door is Audubon's Corkscrew Swamp Sanctuary, "a 13,400-acre nature preserve" and "regionally significant component of the Western Everglades." (*Id.* ¶¶ 41, 42.) It provides habitats for several "federally threatened or endangered" species, including the Florida panther. (*Id.* ¶ 41.) It also connects "to the public trust resources of the Corkscrew Regional Ecosystem Watershed—a 70,000-acre preserve that . . . provide[s] refuge for many" regional bird and large mammal species. (*Id.* ¶ 4.)

In Audubon's telling, the Project will be nothing short of disastrous for both the Sanctuary and the Florida panther. On the property front, Audubon insists the development will hamstring its management of the preserve and severely degrade regional water quality. (*Id.* ¶ 2.) As for the wildlife, Audubon warns the Project will bulldoze critical habitat and cause a spike in vehicle-related panther deaths. (*Id.* ¶¶ 2, 58.)

Though it raised these concerns to FWS and the Corps, Audubon got nowhere. (*Id.* ¶¶ 7, 10.) It now sues the agencies under the Administrative Procedure Act, claiming they arbitrarily and capriciously violated the federal laws mentioned above. (*Id.* ¶¶ 23, 24, 105-22.) Audubon seeks a declaratory

3

judgment to vacate the Project's permit. (*Id.* ¶ 131.) In the meantime, it moves for a preliminary injunction to freeze the permit in place. (Doc. 34.)

Before we can understand exactly what Audubon wants this Court to halt, it helps to look at how a project of this magnitude gets off the ground. Developers do not simply ask nicely and start digging. Instead, they must run a gauntlet of federal, state, and local regulatory reviews.

At the federal level, the linchpin is the Clean Water Act. Because the Project involves filling wetlands, CAM7 needed a Section 404 permit from the Corps. (Doc. 27 at 32.) But the Corps cannot act in a vacuum. Before issuing that permit, it had to consult with FWS to ensure the Project would not jeopardize protected wildlife under the Endangered Species Act. (*Id.* at 30-31.) That consultation produced FWS's "Biological Opinion" in January 2025. (Doc. 34-3.) To satisfy the National Environmental Policy Act, the Corps also had to complete an "Environmental Assessment" to determine if a more rigorous "Environmental Impact Statement" was necessary. (*Id.* at 34-35.) Ultimately, the Corps found no significant impact and issued the Section 404 permit in April 2025. (Doc. 34-2 at 56.) *That* is the permit Audubon attacks.

According to Audubon, the government botched nearly every step of this regulatory process. It accuses the agencies of cutting corners and flouting the core mandates of the Endangered Species Act, the Clean Water Act, and the National Environmental Policy Act. Convinced the entire foundation of

4

the Section 404 permit is legally rotten, Audubon wants the permit—and its underlying reports—tossed out.

## II. Legal Standard

Preliminary injunctive relief "is an extraordinary and drastic remedy that is appropriate only in limited circumstances." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000); *see also Powers v. Sec'y, Fla. Dep't of Corr.*, 691 F. App'x 581, 583 (11th Cir. 2017) ("A preliminary injunction is the exception rather than the rule[.]"). To get such relief, the movant must show (1) "a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1231 (11th Cir. 2005).

This first factor is dispositive. *See, e.g.*, *State of Fla. v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1286 (11th Cir. 2021). If a movant "is unable to show a substantial likelihood of success on the merits, [the court] need not consider the other requirements." *Bloedorn v. Grube*, 631 F.3d 1218, 1229 (11th Cir. 2011). To clear that hurdle, "[i]t is not enough that the chance of success on the merits be better than negligible." *State of Florida*, 19 F.4th at 1286. The movant instead needs to show it has a strong shot at success on at

least one of its claims. *See, e.g.*, *Computer & Commc'ns Indus. Ass'n v. Uthmeier*, No. 25-11881, 2025 WL 3458571, at \*2 (11th Cir. Nov. 25, 2025).

### III. Discussion

Audubon accuses the government of violating a litany of environmental laws. But the legal engine driving each of those claims is the Administrative Procedure Act ("APA"), which dictates exactly how courts must review the work of federal agencies. Under the APA, an agency's "actions must prevail unless [it] acts arbitrarily, capriciously, in abuse of discretion, or otherwise not in accord with law." *SOSS2, Inc. v. United States Army Corps of Eng'rs*, 491 F. Supp. 3d 1231, 1236 (M.D. Fla. 2020) (citing 5 U.S.C. §§ 702, 706). This standard is extremely deferential. *See, e.g.*, *Nat'l Parks Conservation Ass'n v. U.S. Dep't of the Interior*, 835 F.3d 1377, 1384 (11th Cir. 2016). Even more so "when the agency is making decisions within its area of special expertise." *BBX Cap. v. Fed. Deposit Ins. Corp*, 956 F.3d 1304, 1314 (11th Cir. 2020).

"Arbitrary-and-capricious review ultimately boils down to one question: whether the challenged decision is reasonable and reasonably explained." *Finney v. Metro. Life Ins. Co.*, 164 F.4th 1362, 1365 (11th Cir. 2026). It does not let courts substitute their own judgment for that of the agency. *E.g.*, *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*, 605 U.S. 168, 183 (2025); *State of Florida*, 19 F.4th at 1290. Nor does it license courts to

6

conduct their own investigations. *See Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1360 (11th Cir. 2008). Plaintiffs challenging an agency action thus work against the wind.

Undaunted by that deferential standard, Audubon gives it a go. It accuses the Corps and FWS of arbitrarily and capriciously flouting a trio of environmental statutes. According to Audubon, FWS broke the Endangered Species Act by tossing aside the best available science and ignoring the data regarding panther vehicle mortality. (Doc. 27 ¶¶ 107-09.) The Corps, meanwhile, allegedly violated the Clean Water Act by dodging crucial criteria before handing over the dredge-and-fill permit. (*Id.* ¶¶ 114-15.) And to round things out, Audubon claims the Corps failed "to take a hard look at the effects of the proposed Project, issuing their approvals with no Environmental Impact Statement, and without a public hearing, in violation of" the National Environmental Policy Act. (*Id.* ¶ 2.)

At this stage, none of these claims look promising. FWS properly relied on the science it deemed best, and it had no legal duty to issue a take statement for panther vehicle strikes. And the Corps, for its part, didn't miss a step in its own environmental review. Audubon's claims are taken statute by statute below.

But before turning to the statutes, one housekeeping matter. Audubon requests oral argument, and Cam7 asks for an evidentiary hearing—though

7

only if it's on the verge of losing. (Doc. 34-31, Doc. 78-2 at 4.) Neither is necessary. Audubon's request does not identify any factual dispute it wants to shore up with evidence. *See Blue-Grace Logistics LLC v. Fahey*, 340 F.R.D. 460, 471 (M.D. Fla. 2022); *cf. Bruce v. Reese*, 431 F. App'x 805, 806 (11th Cir. 2011) ("A hearing must be held if the facts are bitterly contested and credibility determinations must be made to decide whether injunctive relief should issue."). And since the motion is being denied, Cam7 has no objection to proceeding on the papers. With that out the way, we turn to the merits.

### a. Endangered Species Act

The Endangered Species Act does exactly what the title suggests: it shields vulnerable species from harm. 16 U.S.C. § 1536. It does so by forcing federal agencies to ensure their actions "will not jeopardize" a protected species' "continued existence." *Miccosukee Tribe of Indians of Fla. v. United States*, 566 F.3d 1257, 1262 (11th Cir. 2009) (citing 16 U.S.C. § 1536(a)(2)). Mechanically, this means FWS must prepare a Biological Opinion ("BiOp") whenever a "proposed agency action" might harm such species. *Id.* If the BiOp deems an agency's action unlikely "to cause jeopardy but will" still incidentally harm the species, it must include an Incidental Take Statement ("ITS"). *S.C. Coastal Conservation League v. United States Army Corps of Eng'rs, Charleston Dist.*, 127 F.4th 457, 462 (4th Cir. 2025).

Audubon mounts a two-pronged attack on FWS's BiOp. First, it claims the agency ignored the best scientific data available. Second, it insists a panther-vehicle-mortality ITS should've been included. Both arguments fall short on the existing record.

### i. The Best Scientific Data Available

The Endangered Species Act requires that FWS use "the best scientific and commercial data available" when preparing BiOps. 50 U.S.C. § 402.14(f). Generally, FWS gets to decide which data is best. *See Miccosukee Tribe*, 566 F.3d at 1265 ("The general view is that the agency decides which data and studies are the 'best available' because that decision is itself a scientific determination deserving deference."); *Defs. of Wildlife v. United States Dep't of the Interior*, 931 F.3d 339, 345 (4th Cir. 2019) ("FWS may decide which data and studies are the best available, and its decision is reviewed under a deferential standard."). "In deciding what is best available," FWS has "to seek out and consider all existing scientific data." *Miccosukee Tribe*, 566 F.3d at 1265. But it ultimately can disregard any competing data so long as it explains why. *See Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1068 (9th Cir. 2018) ("Although FWS is free to choose among experts, it must acknowledge that it is doing so."); *Ass'n of Oil Pipe Lines v. FERC*, 876 F.3d 336, 343 (D.C. Cir. 2017) (upholding agency's decision to disregard certain data it previously credited given agency's adequate explanation); *Ctr. for*

*Biological Diversity v. U.S. Fish & Wildlife Serv.*, 488 F. Supp. 3d 1219, 1228 (S.D. Fla. 2020) ("[I]f FWS intended to choose Geoplan on the basis that its underlying SLR projections were more accurate than NOAA 2017, it was required to say so and provide a rationale.").

Audubon thinks the BiOp here ignored the best data on two different topics: panther-vehicle mortality and panther habitat. The Court cannot agree.

Let's start with panther-vehicle mortality. Audubon stresses that FWS initially predicted that the Project's increased traffic would cause four to twenty-three vehicle-related panther deaths in its first year. (Doc. 34 at 5-6.) Now, the BiOp pegs panther mortality at zero. Audubon likes the earlier data and insists *that* is the "the best scientific data available." (*Id.*)

To start, declaring which scientific data is "best" requires the Court to step far outside its lane. *See New Mexico Cattle Growers' Ass'n v. United States Fish & Wildlife Serv.*, No. 21-CV-3263-ACR, 2024 WL 894911, at *12 (D.D.C. Feb. 28, 2024). Judges don robes, not lab coats. We are "ill-equipped to make scientific determinations or choose between competing scientific studies." *Id.* So we leave the science to the scientists and look only for whether relevant data was outright ignored or inadequately explained away. *E.g.*, *Miccosukee Tribe*, 566 F.3d at 1265; *Genuine Parts Co. v. Env't Prot. Agency*, 890 F.3d 304, 346 (D.C. Cir. 2018) ("[A]n agency cannot ignore

10

evidence that undercuts its judgment; and it may not minimize such evidence without adequate explanation.").

Neither is the case here. The BiOp notes FWS previously tried to predict the Project's panther mortality impact. It describes how it used historical vehicle-panther incidents at "roadways in or near a project site or range" and "modeled future traffic numbers" to reach some sensible figure. (Doc. 34-3 at 27.) And it explained that it now considers that methodology unreliable since it produced widely diverging estimates. (*Id.*) On top of that, it cited another study finding that increased traffic and increased panther mortality are not linked. So FWS did not ignore its earlier data; it simply thought better of it and explained why. *Cf. Ctr. for Biological Diversity*, 900 F.3d at 1068-69. "That is all the Endangered Species Act requires the Service to do with the best scientific and commercial data available." *Miccosukee Tribe*, 566 F.3d at 1266.

Audubon separately complaints that the BiOp needed to tackle specific critiques of FWC's preferred panther-vehicle mortality study. But Audubon buries this argument in a single, perfunctory footnote. (*See* Doc. 34 at 7 n.13.) The Court does not go digging for arguments tossed into the margins, and it need not consider this one. *See Contessa v. White Pine INS. Co.*, No. 3:23-CV-00487-JAR-PDB, 2024 WL 4710163, at \*1 (M.D. Fla. Nov. 7, 2024) ("[A]rguments in a footnote are not considered."); *Patterson v. City of*

11

*Melbourne*, 669 F. Supp. 3d 1204, 1221 (M.D. Fla. 2023) ("[A] footnote is not the proper place for such an argument.").

Regardless, FWS did not need to refute every critique to act reasonably. The agency explained exactly why it found the prior data's approach unworkable: its estimates were simply all over the map. For our purposes today, that explanation clears the bar. *See Friends of Animals v. Williams*, No. CV 21-2081 (RC), 2024 WL 3359507, at *13 (D.D.C. July 10, 2024) ("Though the Service did not explicitly explain why it found the other reviewer's feedback less compelling, the Court is satisfied that the agency did not ignore relevant information, but rather examine[d] the relevant data and ... articulate[d] a satisfactory explanation for its action.").

At bottom, FWS was free to change its mind about which vehicle-mortality data was most trustworthy. That it previously relied on a study does not mean it's married to it. The BiOp explained its pivot, and the Court will not second-guess its scientific decisions at this stage. FWS is thus buttoned up as far as vehicle-mortality data goes.

Next, the panther habitat. Audubon claims the BiOp overlooked how crucial the Project region is for panther survival. It explains how the Project area is "squarely located within designated Primary and Secondary Zones, areas described as critical to the panthers' survival." (Doc. 34 at 9.) Audubon

12

also emphasizes that "[p]reservation and restoration of these zones are central to Florida panther recovery plans." (*Id.*)

The BiOp, however, proves FWS actually did the math. It calculates the exact loss of primary and secondary habitat down to the decimal point, and it openly acknowledges the broader significance of those zones. It simply reaches a different conclusion, determining that the Project's footprint will not doom the panther's overall survival. Just because an agency doesn't use the data "in the precise way or to reach the result that [Audubon] would have preferred" does not mean it was ignored. *New York v. Raimondo*, 594 F. Supp. 3d 588, 602 (S.D.N.Y. 2022). Because the BiOp wrestled with the exact information Audubon highlights, it did not impermissibly disregard the best panther-habitat data. *See Miccosukee Tribe*, 566 F.3d at 1266.

### ii. Incidental Take Statement

As mentioned, an ITS is necessary when an agency action is "reasonably certain" to cause "take" to an endangered species. 50 C.F.R. § 402.14(g)(7); *Appalachian Voices v. United States Dep't of Interior*, 25 F.4th 259, 265 (4th Cir. 2022). "Take," for Endangered Species Act purposes, "means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). If "take" is not "reasonably certain" to occur, no ITS is needed. *Cf.* 50 C.F.R. § 402.14(g)(7); *Fish Nw. v. Rumsey*, No. 22-35641, 2023 WL 4071941, at *2 (9th

13

Cir. June 20, 2023); *W. Watersheds Project v. Haaland*, 69 F.4th 689, 699 (10th Cir. 2023); *Conserve Sw. Utah v. U.S. Dep't of the Interior*, No. 26-317 (RDM), 2026 WL 569034, at *2 (D.D.C. Mar. 1, 2026); *Klamath Forest All. v. U.S. Fish & Wildlife Serv.*, No. 2:24-CV-02347-DC-CSK, 2025 WL 2753167, at *2 (E.D. Cal. Sept. 26, 2025).

FWS determined that there was no correlation between panther-vehicle mortality and increased traffic. The BiOp further explained that it could not say "with any certainty" whether the Project would boost panther-vehicle mortality. (Doc. 34-3 at 26.) Given this conclusion, which withstands scrutiny for the reasons stated above, no panther-vehicle mortality oriented ITS was necessary. *See Sovereign Inupiat for a Living Arctic v. Bureau of Land Mgmt.*, 555 F. Supp. 3d 739, 801 n.402 (D. Alaska 2021); *cf. Appalachian Voices v. United States Dep't of Interior*, 25 F.4th 259, 265 (4th Cir. 2022). So Audubon strikes out on its ESA claim.

### ii. The Clean Water Act

The Clean Water Act was passed "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). It generally bars the discharge of dredged or fill material into federal waters. *Id.* § 1311(a); *see also Georgia River Network v. U.S. Army Corps of Eng'rs*, No. 4:10-CV-267, 2012 WL 930325, at *11 (S.D. Ga. Mar. 19,

14

2012). But it gives the Corps authority to issue permits for such discharge if certain standards are met. *See* 40 C.F.R. § 230.10.

These standards include ensuring that "no practicable," less harmful alternative "to the proposed discharge" exists. *Id.* § 230.10(a). They require "appropriate and practicable steps" be "taken which will minimize" the discharge's potential adverse impacts "on the aquatic ecosystem." *Id.* § 230.10(d). And they bar any "discharge of dredged or fill material . . . which will cause or contribute to significant degradation" of federal waters. *Id.* § 230.10(c).

As Audubon sees it, the Corps bypassed these requirements when issuing the Project's discharge permit. Its argument misses the mark though since it is premised on effects and alternatives not directly connected to the actual discharge.

Take Audubon's practicable alternatives point. Audubon says the Corps blew off the modifications it suggested. To be sure, Audubon proposed several design alternatives. Yet none were any substitute for the discharge itself. For example, it asked that the buffer zone between its property and the Project be expanded. But that is not directly discharge-related. It wanted widened wildlife corridors to protect the Florida Panther. Also not directly discharge-related. And it recommended the eventual development's stormwater

15

management system be better designed. We're getting warmer—but still not directly discharge-related.

Section 230.10(a) "make[s] clear that the Corps need only consider alternatives to the discharge itself—not to any environmentally damaging aspect of the project." *Am. Bird Conservancy v. Granholm*, No. CV 19-3694 (TJK), 2023 WL 6276618, at *7 (D.D.C. Sept. 26, 2023). Expecting the Corps to "consider project alternatives untethered to the discharge . . . flouts the Guidelines' text and ignores the CWA's limited purpose." *See Id.* All of Audubon's alternatives envisioned the discharge moving forward precisely as proposed but sought tweaks in certain aspects of the overall project. So the Corps did not improperly overlook them here.

The same goes for the degradation issue. Audubon claims national waters will be devastated by the Project—not the discharge itself. It complains of the increased irrigation the ten-thousand-home development will spur. It worries about turf grass pesticide and fertilizer runoff polluting surrounding waters. And it emphasizes that the development's stormwater management system would be routed through sensitive wetlands. All valid concerns. And all flow from the larger Project rather than the proposed discharge. *See Ctr. for Biological Diversity v. U.S. Army Corps of Eng'rs*, 941 F.3d 1288, 1294-96 (11th Cir. 2019). "[E]ven if the Corps' permit is a but-for cause of those effects, it is not a proximate—or legally relevant—cause." *Id.*

16

So the Corps did not have to consider them within this narrow context. *See City of Shoreacres v. Waterworth*, 420 F.3d 440, 449 (5th Cir. 2005) ("§ 230.10(c) does not, however, require the Corps to consider the effects of the Bayport terminal itself once it begins operations."); *Red Lake Band of Chippewa Indians v. United States Army Corps of Eng'rs*, 636 F. Supp. 3d 33, 68 (D.D.C. 2022) ("In other words, the Corps' analysis of potential "significant degradation of the waters of the United States" was appropriately tailored to potential effects arising from the "discharge of dredged or fill material" authorized by its permits. The Corps was not required under this provision to assess a potential oil spill that could result from the operation of the new pipeline."). Audubon thus fails to show its Clean Water Act claim is substantially likely to prevail.

### iii. National Environmental Policy Act

The National Environmental Policy Act established a "national policy [to] encourage productive and enjoyable harmony between man and his environment." 42 U.S.C. § 4321. It "was intended to reduce or eliminate environmental damage and to promote the understanding of the ecological systems and natural resources important to the United States." *Nat. Res. Def. Council v. Nat'l Park Serv.*, 250 F. Supp. 3d 1260, 1284 (M.D. Fla. 2017).

Unlike other environmental laws, the National Environmental Policy Act does not mandate specific results. It just mandates a process. *Id.*; *Seven*

17

*Cnty. Infrastructure Coal.*, 605 U.S. at 180. Before taking any significant action, a federal agency must prepare an Environmental Assessment ("EA") that takes a "hard look" at the project's environmental effects. *See City Of Oxford, Ga. v. F.A.A.*, 428 F.3d 1346, 1352 (11th Cir. 2005); *Wilderness Watch & Pub. Emps. for Env't Resp. v. Mainella*, 375 F.3d 1085, 1096 (11th Cir. 2004). If the EA uncovers significant environmental impacts, the procedural demands ramp up, requiring the agency to draft a full-blown Environmental Impact Statement ("EIS"). *See, e.g.*, *Lowman v. Fed. Aviation Admin.*, 83 F.4th 1345, 1349 (11th Cir. 2023); *Friends of Etna Turpentine Camp, Inc. v. U.S. Dep't of the Interior*, No. 5:18-CV-291-OC-30PRL, 2018 WL 3344405, at *3 (M.D. Fla. July 9, 2018).

The Corps found that the Project will not have any such impact and prepared no EIS. (Doc. 34-2 at 56.) Audubon takes issue with that. It claims the Corps took no "hard look" at the Project's impacts since it ignored its cumulative effects and the effects to the Sanctuary. True, Courts "will overturn an agency's decision as arbitrary and capricious under 'hard look' review if . . . the agency failed entirely to consider an important aspect of the problem." *Sierra Club v. U.S. Army Corps of Eng'rs*, 295 F.3d 1209, 1216 (11th Cir. 2002). But that isn't what we have here, at least on the existing record.

18

The Corps's EA confronts the Project's cumulative effects head on. It notes that the Project will be situated in an area that is "trending towards additional development" on "remaining lands." (Doc. 34-2 at 41.) Several of these developments are identified by name and their collective environmental impacts are analyzed. In the end, the agency concludes those impacts "will be minimized and mitigated" and reeled in by regulations. (*Id.* at 42.) Against this backdrop, the Corps didn't disregard the cumulative impacts so much as it judged them manageable. *See Club v. United States Army Corps of Eng'rs*, No. 8:20-CV-287-CEH-JSS, 2022 WL 17465560, at *6 (M.D. Fla. Sept. 1, 2022) (finding Corps conducted sufficient cumulative impact analysis where it discussed planned developments along with instant project's potential growth-inducing effects on surrounding area); *Cf. Nat'l Wildlife Fed'n v. Souza*, No. 08-14115-CIV, 2009 WL 3667070, at *26 (S.D. Fla. Oct. 23, 2009) (concluding Corps failed to assess cumulative impacts of subject project and nearby development given "Corps's failure to even discuss the cumulative impact of these developments in the [EA]"). Though Audubon understandably disagrees with "the conclusions made, the [C]ourt's only role under NEPA is to ensure that the agency has taken a 'hard look' at environmental impacts of proposed action." *Club*, 2022 WL 17465560, at *6. It seems the Corps did its job here.

19

The same is true for the effects to the Sanctuary. Audubon cites various risks to the Sanctuary's water quality and upkeep along with "the [Project's] resultant economic effects." (Doc. 34 at 20-21.) But the Corps accounted for all that. Its EA expressly mentions how the Project "would affect aquatic resources" associated with the Sanctuary and watershed. (Doc. 34-2 at 1). It identifies restored wetlands which "will provide habitat connectivity and downstream water quality benefits to" the Sanctuary and Corkscrew Regional Ecosystem Watershed. (*Id.* at 23.) And it further indicates that the Project would bring "regional wildlife habitat and flow-way corridors that [would] complement" Audubon's adjacent property. (*Id.* at 41-42.). But perhaps most telling is the EA's "Consideration of Property Ownership" section. (*Id.* at 35.) There the Corps finds that the Project "will not hinder surrounding property owners from enjoying, maintaining, or developing their properties[.]" (*Id.*)

That Audubon didn't get more of a special shoutout in the fifty-plus page EA does not render it deficient. Nor did the Corps need to pen a treatise on each one of Audubon's specific concerns. *See Wilderness Watch & Pub. Emps. for Env't Resp. v. Mainella*, 375 F.3d 1085, 1095 (11th Cir. 2004) ("Documentation of reliance on a categorical exclusion need not be detailed or lengthy; it need only indicate that the agency indeed considered whether or not a categorical exclusion applied and concluded that it did."); *N. Buckhead*

20

*Civic Ass'n v. Skinner*, 903 F.2d 1533, 1543 (11th Cir. 1990) ("Although the EIS does not contain what appellants feel is a detailed and careful analysis of the environmental consequences of the proposed action and the possible alternatives, we cannot find error in the district court's conclusion that NEPA did not require a detailed discussion of the no build/heavy rail alternative in the EIS."); *Center for Biological Diversity*, 488 F. Supp. 3d at 1231 ("The SA Form expressly considered the potential for cumulative impacts to the subspecies' needs. In light of the SSA's conclusion that these threats were not acute, the Listing Decision was not arbitrary and capricious for failing to discuss each of these stressors in detail."). The Corps clearly appreciated Audubon's comments but felt the Project would not be all that harmful. So the Corps's failure to prepare an EIS was not arbitrary or capricious.

## IV. Conclusion

Preliminary injunctions are extraordinary remedies, and Audubon has not shown it is entitled to one here. Based on the current record, the agencies reviewed the facts they needed to and properly bypassed the rest. Perhaps the full Administrative Record will tell a different story down the road. But for now, the Motion for Preliminary Injunction (Doc. 34) is **DENIED**. The accompanying requests for oral argument (Doc. 34-30) and an evidentiary hearing (Doc. 78-2) are also **DENIED**.

**ORDERED** in Fort Myers, Florida on March 24, 2026.

Kyle C. Dudek
United States District Judge